IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            PLAINTIFF,           )
                                )
                                )
      vs.                       ) Case No. 4:12-CR-251-CEJ
                                )
JOHN BAILEY,                    )
                                )
            DEFENDANT.          )
                                )
-----------------------------------

BEFORE THE HONORABLE CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE
CHANGE OF PLEA & SENTENCING TRANSCRIPT
SEPTEMBER 17 & DECEMBER 18, 2012

COURT REPORTER:     GARY BOND, RMR, RPR
                    THOMAS F. EAGLETON COURTHOUSE
                    111 S. TENTH STREET, THIRD FLOOR
                    ST. LOUIS, MISSOURI 63102
                    314.244.7980

1                          APPEARANCES

2

3

4    FOR THE PLAINTIFF:

5                    U.S. ATTORNEY'S OFFICE
                     BY:   JENNIFER WINFIELD, ESQ.
6                    101 S. 10TH STREET, SUITE 2000
                     ST. LOUIS, MISSOURI   63102
7                    314.539.2200
                     CHRIS.JORCKE@USDOJ.GOV
8

9    FOR THE DEFENDANT:

10                   BRADFORD KESSLER, PC
                     BY:   BRADFORD KESSLER, ESQ.
11                         NICHOLAS WILLIAMS, ESQ.
                     1520 WASHINGTON AVENUE
12                   ST. LOUIS, MISSOURI    63103
                     314.863.6363

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX

2                                               PAGE

3

4

5    CHANGE OF PLEA HEARING:                      4
     SENTENCING HEARING:                         23
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ST. LOUIS, MISSOURI; SEPTEMBER 17, 2012

10:00 a.m

CHANGE OF PLEA HEARING

1   THE COURT:   Mr. Bailey, have you received a copy of

2   the indictment?

3   THE DEFENDANT:   Yes, ma'am

4   THE COURT:   Count 1 charges you with conspiracy to

5   possess with intent to distribute anabolic steroids, and

6   that's a violation of Title 21 United States Code Section

7   846.   Do you understand the charge in Count 1?

8   THE DEFENDANT:   Yes, ma'am

9   THE COURT:   Count Two charges you with conspiracy to

10  commit money laundering, and that is a violation of Title 18

11  United States Code Section 1956(h).   Do you understand?

12  THE DEFENDANT:   Yes, ma'am

13  THE COURT:   There is also a forfeiture allegation in

14  the indictment that alleges that certain property, including

15  currency, was used in or represented the proceeds of the

16  unlawful transactions alleged in this indictment.   Do you

17  understand the forfeiture allegation?

18  THE DEFENDANT:   Yes, ma'am

19  THE COURT:   What is your plea to Counts 1 and 2 and

20  the forfeiture allegation?

21  THE DEFENDANT:   Guilty, ma'am

22  THE COURT:   I have to ask you some questions before

1    I can accept your guilty plea; and I'd like you to give your

2    answers under oath.  So would you please raise your right

3    hand?

4         (Whereupon, the defendant was sworn.)

5         THE COURT:  Now that you've taken the oath, you have

6    to give true answers to my questions.  If you don't tell the

7    truth, you could be prosecuted for perjury or for making a

8    false statement.  Do you understand?

9         THE DEFENDANT:  Yes, ma'am

10        THE COURT:  Let me know if you would like me to

11    repeat a question or to explain a question to you.  And if

12    you want to talk to your lawyer before you give an answer,

13    just tell me; and I'll give you time to speak with him  All

14    right?

15        THE DEFENDANT:  Thank you.

16        THE COURT:  Mr. Bailey, how old are you?

17        THE DEFENDANT:  I'm 38 years old, ma'am

18        THE COURT:  What is your educational background?

19        THE DEFENDANT:  I have a GED with some college.

20        THE COURT:  Do you have any health problems?

21        THE DEFENDANT:  No, ma'am

22        THE COURT:  Have you taken any prescription medicine

23    or over-the-counter medicine in the last 24 hours?

24        THE DEFENDANT:  I've taken sinus medication, and

25    I've taken Ambien which is prescribed to me by a doctor.

1          THE COURT:   I'm sorry.   What was the second one,

2     sir?

3          THE DEFENDANT:   Ambien.

4          THE COURT:   And what is Ambien for?

5          THE DEFENDANT:   It's a sleep accelerator.

6          THE COURT:   Are these the only medicines you've

7     taken in the last 24 hours?

8          THE DEFENDANT:   Yes, ma'am

9          THE COURT:   Do either of these medicines, either the

10    sinus medicine or the Ambien, have any adverse effects on

11    you?

12         THE DEFENDANT:   No, ma'am

13         THE COURT:   Do you feel drowsy or sleepy or anything

14    like that this morning?

15         THE DEFENDANT:   No, ma'am

16         THE COURT:   Are you feeling all right this morning?

17         THE DEFENDANT:   Yes, ma'am

18         THE COURT:   Have you used any illegal drugs or drunk

19    any alcohol in the last 24 hours?

20         THE DEFENDANT:   No, ma'am

21         THE COURT:   Have you ever been diagnosed with a

22    mental illness?

23         THE DEFENDANT:   No, ma'am

24         THE COURT:   Have you ever consulted a psychologist

25    or therapist or any mental health professional for any

1    reason?

2              THE DEFENDANT:   Anger management, ma'am

3              THE COURT:   And when was that?

4              THE DEFENDANT:   2006, ma'am

5              THE COURT:   Were you prescribed any medication for

6    that condition?

7              THE DEFENDANT:   At the time, yeah, I was taking

8    Xanax.

9              THE COURT:   Are you still receiving treatment for

10   anger management?

11             THE DEFENDANT:   No, ma'am

12             THE COURT:   When did you stop?

13             THE DEFENDANT:   My anger management ended 2008.

14             THE COURT:   I'm sorry?

15             THE DEFENDANT:   2008.   I was receiving the anger

16   management counselling through the federal bureau of prisons.

17   The counselor determined, along with my Probation Officer

18   Raoul Williams, that further counselling was unnecessary.

19             THE COURT:   Is that the only mental health treatment

20   you've received?

21             THE DEFENDANT:   Yes, ma'am

22             THE COURT:   Do you understand why you're here this

23   morning?

24             THE DEFENDANT:   Yes, ma'am

25             THE COURT:   Do you understand the purpose of this

1    hearing?

2           THE DEFENDANT:  Yes, ma'am

3           THE COURT:  Mr. Kessler, do you have any reason to

4    doubt your client's mental competence?

5           MR. KESSLER:  No, Your Honor.

6           THE COURT:  Mr. Bailey, have you had enough time to

7    talk to your lawyer about this case?

8           THE DEFENDANT:  Yes, ma'am

9           THE COURT:  Have you talked to him about whether or

10    not you should plead guilty?

11           THE DEFENDANT:  Yes, ma'am

12           THE COURT:  Are you satisfied with the legal

13    representation that you've received?

14           THE DEFENDANT:  Yes, ma'am

15           THE COURT:  By pleading guilty, you are giving up

16    your right to a speedy and public jury trial.  Do you

17    understand?

18           THE DEFENDANT:  Yes, ma'am

19           THE COURT:  If there were a trial, you would be

20    entitled to the presumption of innocence.  You would not have

21    the burden of proving to the jury that you are innocent.  Do

22    you understand?

23           THE DEFENDANT:  Yes, I do.

24           THE COURT:  The government would have the burden of

25    proving your guilt beyond a reasonable doubt if there were a

1   trial.   Do you understand?

2          THE DEFENDANT:   Yes, ma'am

3          THE COURT:   You would have the right to be present

4   in the courtroom throughout the trial and the right to

5   cross-examine all of the government's witnesses.   Do you

6   understand?

7          THE DEFENDANT:   Yes, ma'am

8          THE COURT:   You would also have the right to call

9   witnesses to testify in your defense.   And if you needed the

10  Court to issue subpoenas or other process to compel your

11  witnesses to come here, the Court would provide that service

12  to you free of charge.   Do you understand?

13         THE DEFENDANT:   Yes, ma'am

14         THE COURT:   You would have the right to testify and

15  the right not to testify if there were a trial.   Do you

16  understand?

17         THE DEFENDANT:   Yes, ma'am

18         THE COURT:   If you chose not to testify, the jury

19  could not take that into consideration in deciding whether

20  you are guilty or not guilty.   Do you understand?

21         THE DEFENDANT:   Yes, ma'am

22         THE COURT:   The next time you come to court will be

23  for sentencing.   You will not have a trial.   Do you

24  understand?

25         THE DEFENDANT:   Yes, ma'am

1          THE COURT:   You will have to admit that you

2     committed the crimes charged in Counts 1 and 2 of the

3     indictment.   Do you understand that?

4          THE DEFENDANT:   Yes, ma'am

5          THE COURT:   Do you have any questions about the

6     rights that you're giving up by pleading guilty?

7          THE DEFENDANT:   No, ma'am

8          THE COURT:   Now that you know what you're giving up,

9     do you still want to plead guilty?

10         THE DEFENDANT:   Yes, ma'am

11         THE COURT:   Has anyone made any threats to you to

12    force you to plead guilty?

13         THE DEFENDANT:   No, ma'am

14         THE COURT:   Has anyone made a promise to you about

15    what your sentence will be?

16         THE DEFENDANT:   No, ma'am

17         THE COURT:   Apart from the plea agreement that you

18    have with the government, have any promises been made to you

19    in exchange for your guilty plea?

20         THE DEFENDANT:   No, ma'am

21         THE COURT:   Are you pleading guilty voluntarily?

22         THE DEFENDANT:   Yes, ma'am

23         THE COURT:   I'd like you to take a look at this

24    document, Mr. Bailey.   It's called Guilty Plea Agreement.   Is

25    that your signature on page 16, which is the last page of

1 this document?

2    THE DEFENDANT:  Yes, ma'am, it is.

3    THE COURT:  Before you signed this document, did you

4 discuss it with your lawyer?

5    THE DEFENDANT:  Yes, ma'am

6    THE COURT:  Did you read the document?

7    THE DEFENDANT:  Yes, ma'am

8    THE COURT:  Do you understand what it says?

9    THE DEFENDANT:  Yes, ma'am, I do.

10    THE COURT:  Does this document contain all of the

11 agreements between you and the government concerning this

12 case?

13    THE DEFENDANT:  Yes, ma'am

14    THE COURT:  I believe there may be a typographical

15 error on page seven.  Under the penalties for Count two, I

16 believe the fine isn't more than $500,000 or twice the value

17 of the property.

18    MS. WINFIELD:  Your Honor, can we write it on your

19 copy and then initial it?

20    THE COURT:  That's fine.

21    Mr. Bailey, there is a typographical error on page

22 seven of the plea agreement in the description of the

23 penalties for Count Two.  And I understand that the

24 correction to that penalty section has been made in

25 handwriting and on the plea agreement.  Have you reviewed

1    that change with --

2            THE DEFENDANT:  Yes, ma'am.  Just now.

3            THE COURT:   And do you understand why that change

4    was made?  It's really a correction more so than a change.

5    Do you understand that?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:   And have you initialled the handwriting

8    on that page to indicate your agreement with it?

9            THE DEFENDANT:  Yes, I have, ma'am.

10           THE COURT:   Okay.   Thank you.

11           According to the plea agreement, in exchange for

12   your guilty plea to Counts 1 and 2 and the forfeiture, the

13   government has agreed that it will not bring any further

14   federal prosecution against you in the Eastern District of

15   Missouri relative to your involvement in the charged

16   conspiracies and related or accompanying financial charges as

17   set forth in the indictment.

18           Is that a correct statement of what the government

19   has agreed to do?

20           THE DEFENDANT:  Yes, ma'am, it is.

21           THE COURT:   In this document, you've agreed to

22   forfeit or give up all interest that you have in certain

23   property that is described in the forfeiture allegations of

24   the complaint -- I'm sorry -- of the indictment and on page

25   two of the plea agreement.   Is that correct?

1        THE DEFENDANT:  Yes, ma'am

2        THE COURT:  By agreeing to the forfeiture that means

3   that the property will not be returned to you.  Do you

4   understand?

5        THE DEFENDANT:  Yes, ma'am

6        MR. KESSLER:  Judge, for the record, that was all

7   property of Mr. Campbell's, which we make no claim against in

8   any event.

9        THE COURT:  So Mr. Bailey is not making any claim to

10  any of the property described in the forfeiture allegation?

11       MR. KESSLER:  That's correct.

12       THE COURT:  Is that right, Mr. Bailey?

13       THE DEFENDANT:  Yes, ma'am, that's correct.

14       THE COURT:  All right, good.

15       In this document, Mr. Bailey, you have agreed to

16  give up your right to appeal all nonjurisdictional and

17  nonsentencing issues.  Is that right?

18       THE DEFENDANT:  Yes, ma'am

19       THE COURT:  You've also agreed to give up your right

20  to appeal the sentence if the sentence is within or below the

21  range based on the Sentencing Guidelines that you and the

22  government have agreed to.  Is that correct?

23       THE DEFENDANT:  That's correct, ma'am

24       THE COURT:  You are reserving your right to appeal

25  any issue concerning your criminal history.  Is that correct?

1     THE DEFENDANT: Yes, ma'am

2     THE COURT: You've agreed in this document to give

3 up your right to challenge your conviction and sentence in a

4 post-conviction, proceeding unless the challenge is based on

5 a claim of prosecutorial misconduct or ineffective assistance

6 of counsel. Is that correct?

7     THE DEFENDANT: That's correct.

8     THE COURT: Mr. Bailey, I am not a party to and I am

9 not bound by any agreement that you and the government have

10 reached in this case. Do you understand?

11     THE DEFENDANT: Yes, ma'am, I do.

12     THE COURT: Specifically, I am not required to

13 follow any recommendations that you and the government make

14 concerning the Sentencing Guidelines. Do you understand

15 that?

16     THE DEFENDANT: Yes, I do, ma'am

17     THE COURT: I will determine the Sentencing

18 Guidelines that apply in this case and how they apply. And

19 if you disagree with my determination, that will not give you

20 the right to withdraw your guilty plea. Do you understand?

21     THE DEFENDANT: I understand, ma'am

22     THE COURT: If you receive a sentence that is worse

23 than you expected it to be, that also will not give you the

24 right to withdraw your guilty plea. Do you understand?

25     THE DEFENDANT: Yes, ma'am

1    THE COURT:  The penalties for the offense in Count 1

2    include a sentence of not more than ten years in prison or a

3    fine of not more than $500,000 or both.  Do you understand?

4    THE DEFENDANT:  Yes, ma'am, I do.

5    THE COURT:  The penalties for Count 2 include a

6    sentence of not more than 20 years in prison or a fine of not

7    more than $500,000 or twice the value of the property

8    involved in the transaction, whichever is greater; or you may

9    receive a sentence of imprisonment and a fine.  Do you

10   understand?

11   THE DEFENDANT:  Yes, ma'am

12   THE COURT:  At sentencing, you will have to pay a

13   100-dollar assessment for each count for a total of $200.  Do

14   you understand that?

15   THE DEFENDANT:  Yes, ma'am

16   THE COURT:  Also, after any sentence of imprisonment

17   that you receive, you will be placed on supervised release

18   for a period of not less than two years and not more than

19   three years for Count 1, and a term of supervised release of

20   not more than three years for Count 2.  Do you understand?

21   THE DEFENDANT:  Yes, ma'am

22   THE COURT:  Conditions of supervised release will be

23   explained to you at sentencing and you will have to follow

24   all of those conditions.  If you violate a condition, your

25   supervised release term could be revoked, and you could be

1    sentenced to a term of imprisonment equal to the length of

2    the supervised release term   Do you understand?

3              THE DEFENDANT:   Yes, ma'am

4              THE COURT:   After you complete that sentence of

5    imprisonment, you could be placed on supervised release

6    again.   Do you understand?

7              THE DEFENDANT:   Yes, ma'am

8              THE COURT:   You will not be released on parole from

9    any sentence of imprisonment that you receive.   Do you

10   understand?

11             THE DEFENDANT:   Yes, ma'am

12             THE COURT:   By pleading guilty, you are exposing

13   yourself to the maximum and minimum penalties I've just

14   described to you.   Do you understand?

15             THE DEFENDANT:   Yes, ma'am

16             THE COURT:   Before sentencing, the Probation Office

17   will complete a Presentence Report that you will have the

18   opportunity to review with your lawyer and make objections

19   to.   After I rule on all of the objections, I will determine

20   your sentence by taking into consideration the information in

21   the Presentence Report; other information that you or the

22   government provide to me before or at sentencing; the

23   Sentencing Guidelines; and all other factors that the law

24   requires me to consider.   Do you understand?

25             THE DEFENDANT:   Yes, ma'am

1      THE COURT:  Do you have any questions about the

2  penalties that you're facing or about anything that I've said

3  to you this morning?

4      THE DEFENDANT:  No, ma'am, I don't.

5      THE COURT:  Please tell me what you did in

6  connection with Counts 1 and 2.

7      THE DEFENDANT:  I was roommates with Mr. Campbell.

8  I was directed and took money from Mr. Campbell to Western

9  Union offices and sent that money to certain places that I

10  was told to.  And in return, steroids came from those places

11  in my post-office box and other post-office boxes that were

12  paid for by Mr. Campbell.

13      THE COURT:  Well, let me ask you, Mr. Bailey:  Did

14  you know that the money that you were sent that these were

15  wire transfers or Western Union transfers that you were

16  sending to other countries?

17      THE DEFENDANT:  Yes, ma'am

18      THE COURT:  Did you know that they were for the

19  purchase of anabolic steroids?

20      THE DEFENDANT:  Yes, ma'am

21      THE COURT:  You knew that at the time that you were

22  doing it?

23      THE DEFENDANT:  Yes, ma'am, I did.

24      THE COURT:  Did Mr. Campbell or anyone else force

25  you to do this?

1      THE DEFENDANT:   There was no coercion, ma'am, no.

2      THE COURT:   You did it voluntarily?

3      THE DEFENDANT:   I did it voluntarily.

4      THE COURT:   All right.   You and the government have

5 agreed that the quantity of anabolic steroids that is

6 attributable to you is at least one kilogram and not more

7 than 2.5 kilograms.   Is that correct?

8      THE DEFENDANT:   That is -- yes, ma'am

9      THE COURT:   Now tell me about the money laundering

10 count.   What did you do in connection with that?

11      THE DEFENDANT:   Again, ma'am, I took money from

12 Mr. Campbell.   I sent it to places that I was directed to

13 send it to.   He gave me pieces of paper with specific

14 instructions; countries; names; things of that nature.   I

15 took the money from him   I took them to the Western Union

16 office; Schnucks; all around St. Louis, Missouri.   And I've

17 sent it to other countries to the people I was instructed to.

18      THE COURT:   Okay.   Were you involved with

19 Mr. Campbell in concealing the proceeds from the sales of

20 anabolic steroids?

21      THE DEFENDANT:   My only involvement was to send the

22 money, Your Honor.

23      MR. KESSLER:   Judge, the purpose was to send it in

24 someone's name other than Mr. Campbell's thereby concealing

25 the proceeds that Mr. Campbell had received.

1          THE DEFENDANT:   From that aspect then, yes, ma'am

2          THE COURT:   So the money that was being sent for the

3   purchase of anabolic steroids, the source -- the true source

4   of that money -- was not disclosed.   Is that right?

5          THE DEFENDANT:   No, ma'am

6          THE COURT:   And the packages that contained the

7   anabolic steroids were sent to your post-office box?

8          THE DEFENDANT:   Yes, ma'am

9          THE COURT:   Was that a post-office box that was held

10  in your name?

11         THE DEFENDANT:   Yes, ma'am   My post-office box

12  is -- the post-office boxes that were used were purchased in

13  my name, his name was also attached to them so that he could

14  receive shipments there.

15         THE COURT:   Mr. Bailey, were some of these shipments

16  or these post-office boxes in the name of Midwest Securities?

17         THE DEFENDANT:   No, ma'am   They were all in my

18  name.   The post-office boxes were -- shipments were sent to

19  the post-office boxes to Midwest Securities, but the

20  post-offices boxes were rented in my name.

21         MR. KESSLER:   Judge, if I might?   I mean, the

22  purpose of renting them in his name was to conceal

23  Mr. Campbell or Midwestern.   I'm not sure that he knew every

24  name of shipments that might be coming, because obviously his

25  purpose was to conceal whatever was coming under whatever

1    name; and by using his post-office box help them to conceal

2    those shipments.

3              THE COURT:   All right.   Mr. Bailey, were you

4    involved in these conspiracies with Mr. Campbell in the

5    St. Louis area?

6              THE DEFENDANT:   Yes, ma'am

7              THE COURT:   And were you involved in the

8    conspiracies in Counts 1 and 2 at any time between June of

9    2007 and June of 2012?

10             THE DEFENDANT:   Yes, ma'am   I met Mr. Campbell in

11   2009.

12             THE COURT:   Okay.   Mr. Bailey, if you still have a

13   copy of the plea agreement, please turn to page four.   There

14   is a Statement of Facts that begins at the top of that page

15   and ends at the bottom of page six.   Did you review that

16   Statement of Facts with your lawyer?

17             THE DEFENDANT:   Yes, ma'am, I did.

18             THE COURT:   Do you agree with this Statement of

19   Facts?

20             THE DEFENDANT:   Yes, ma'am

21             THE COURT:   And does it accurately describe what you

22   did?

23             THE DEFENDANT:   Yes, ma'am

24             THE COURT:   Based on the defendant's statements

25   under oath and the Statement of Facts in the plea agreement,

I find that the defendant is competent to enter a plea of guilty; that he is pleading guilty voluntarily and intelligently; and his guilty plea has a factual basis establishing all of the elements of the offenses charged in Counts 1 and 2.

I'm sorry. Would you all step up for a moment?

(Whereupon, a sealed sidebar conference took place.)

THE COURT: I will accept the defendant's guilty plea and sentencing will be on December 18th at 9:30. According to the Pretrial Services Office, Mr. Bailey had one violation of the conditions of his bond that occurred in July maybe a week or so after he was released; that was testing positive for marijuana but there have been no violations since then. Is there any objection to continuing the defendant's release?

MS. WINFIELD: No, Your Honor.

THE COURT: Mr. Bailey, all of the conditions of your bond will remain in effect. One of those conditions is that you appear as required. And if you violate that condition, you could be charged with a new crime. Violation of the appearance condition or any other condition of the bond could result in a revocation of your release. Do you understand?

THE DEFENDANT: Yes, ma'am

THE COURT: If you have any questions about the bond

1   conditions, you should talk to your lawyer or to the Pretrial

2   Services Officer, and they should be able to answer any

3   questions that you have.  Do you have any questions about the

4   bond conditions this morning?

5           THE DEFENDANT:   No, ma'am

6           THE COURT:   Is there anything else on this case?

7           MS. WINFIELD:   No, Your Honor.  Thank you.

8           MR. KESSLER:   No, Your Honor.

9           THE COURT:   All right.  We're in recess.

10          (Proceedings concluded at 10:32.)

11

12

13                              *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

ST. LOUIS, MISSOURI; DECEMBER 18, 2012

10:15 a.m

SENTENCING HEARING

THE COURT:   United States V. John Thomas Bailey.
Good morning.

MR. WILLIAMS:   Good morning, Your Honor.   Nick
Williams on behalf of Mr. Bailey.

THE COURT:   Mr. Bailey, did you receive a copy of
the Presentence Report?

THE DEFENDANT:   Yes, Your Honor.

THE COURT:   And have you reviewed the report with
your lawyer?

THE DEFENDANT:   Yes, Your Honor.

THE COURT:   I seem to be missing something.   Excuse
me one moment.   There was an objection or objections to the
Presentence Report.   And all of these objections are based on
the assessment of a six-level enhancement under section
2(s)(1.1)(b)(1) of the guidelines.   And as reflected in the
Presentence Report, in the plea agreement, the parties agreed
to a two-level enhancement under Section 2(s)(1.3)(b)(1), and
the Probation Office determined that that was not correct.
So what about this, Mr. Williams?

MR. KESSLER:   Your Honor, our position is that we
rely on the plea agreement that was made with the government.
In that plea agreement, the total offense level was

1  calculated to be 23 compared to the 27 that was later

2  calculated by the Probation Office.

3  THE COURT:  Well, I understand you want the Court to

4  apply the guideline that provides for the two-level increase.

5  But tell me:  Why does that apply?

6  MR. WILLIAMS:  It's applicable, because that was the

7  agreement we made with the government as submitted by the

8  government.  And based on the total offense level calculated

9  in the plea agreement, Mr. Bailey agreed to that.

10  THE COURT:  Okay.  Let me try this again, because

11  maybe we're talking past each other.  Just because you and

12  the government agreed to a particular guideline, if it's the

13  wrong guideline, it's the wrong guideline.  I mean, you could

14  have agreed that the base offense level for this crime was

15  six.  That would be wrong.  So you've agreed to a two-level

16  increase based on Section 2(s)(1.3)(b)(1), and you're asking

17  me to apply it simply because that's what you agreed to?

18  MR. WILLIAMS:  Your Honor, I will defer to the Court

19  as to how you apply it.  I don't mean to restate myself

20  but --

21  THE COURT:  Yes, I think you do.  I'm trying to

22  understand.  I'm not trying to play games.

23  MR. WILLIAMS:  I mean I'm not --

24  THE COURT:  If you're telling me, you know, "This is

25  what with we agreed to and I want you to enforce our

agreement or respect our agreement whether it was right or wrong," that's fine. If you're telling me that this six-level guideline doesn't apply, then that's another thing.

MR. WILLIAMS: And I'm not saying that, Judge.

THE COURT: Okay. Good. All right. Ms. Winfield, do you have anything you want to say about this?

MS. WINFIELD: Yes, Your Honor. My understanding, after speaking with Mr. Williams, is the PSR is calculated correctly. I believe Mr. Williams is just asking that the Court apply our plea agreement at this point in time because we realize there was a mistake made in our assessment. So, at this time, the government of course has no objection, because we didn't file any objection. I just believe that, after speaking with Mr. Williams, he's just asking the Court to apply our plea agreement. It wasn't the assessment by Probation Office, which is correct.

THE COURT: Okay. Thank you. I understand now.

Well, here's the thing: Whether this two-level increase that you all agreed to resulted from mistake or oversight, I don't know. But clearly this is not the guideline that applies in this case. And I know that I told Mr. Bailey at the time of his plea that I'm not bound by any agreement that he and the government may have concerning the guidelines; and that I make an independent determination of the guidelines, which might be different from the agreement;

1    and that's exactly what has happened here.   I also know that

2    he was told at the time of his plea that if he disagreed with

3    my determination of the guidelines or if he received a

4    sentence that was worse than he expected, that that would not

5    entitle him to withdraw his guilty plea.

6            And that is the situation that we have today.

7    Mr. Bailey is facing a higher guideline range because the

8    guideline 2(s)(1.1)(b)(1) applies, which provides for a

9    six-level increase in his offense level as opposed to the

10   two-level increase that he had hoped for.

11           There is no dispute that the 2(s)(1.1)(b)(1)

12   guideline applies in this case.   And I believe it is

13   appropriate to apply that guideline.   So the defendant's

14   objection to the Presentence Report is overruled.   I

15   understand that you are asking that the Court give effect to

16   your plea agreement.   That is certainly one thing that I will

17   take into consideration in making the ultimate determination

18   about sentencing, but I don't believe that giving respect to

19   the plea agreement supports the objection that has been made.

20   So the objection is overruled.

21           There were on objections filed by the government.

22   So the Court will adopt the factual statements of the

23   Presentence Report as its Findings of Fact.

24           In addition to the Presentence Report, I received

25   letters that were written.   There were a couple of letters

that I received from a Mr. Chote and a Miss Sanderson
(phonetic).  Should I have received any other letters?

THE DEFENDANT:  Yes, ma'am  You should have
received one from my grandmother Joyce Caster; one from a
Julie Commanshield; one from Cad Corsey; one from Bruce
English; one from Tim Davis (phonetic).

THE COURT:  Were those mailed directly to me?

THE DEFENDANT:  Yes, ma'am

THE COURT:  I'm sorry, Mr. Bailey, they were not
received.  When letters are written to me directly concerning
a defendant about to be sentenced, I routinely forward those
letters to the Clerk's Office for filing.  And that's what I
did with respect to the two letters that I just mentioned.
If I received letters from those other individuals, I would
have done the same thing.  So I'm not sure why I didn't get
them, but I didn't receive them  I'm sorry.

Okay.  And, Mr. Williams, are you aware of anything
else that I should have received on Mr. Bailey's behalf?

MR. WILLIAMS:  Nothing, other than the letters that
he previously mentioned, Your Honor.

THE COURT:  Okay.  All right.  Is there any legal
reason that sentence should not be imposed at this time?

MR. WILLIAMS:  Yes, Your Honor.  May we approach?

THE COURT:  Yes.  Oh, I'm sorry, there is one other
thing:  I did receive the motion this morning from the

government.   Is that what you want to talk about?

                MR. WILLIAMS:   Yes.

                THE COURT:   Okay.

        (Whereupon, a sealed sidebar conference took place.)

                THE COURT:   With respect to the government's motion,

it is based on Section 5(k)(1.1) of the guidelines and

Section 3553(a) of Title 18.   The motion has been filed under

seal.   We've had some discussion here at the bench, and our

bench conference will also be sealed.   I believe that both

parties have had the opportunity to address the issue.   And

based on the information in the motion, the written motion as

well as the additional information submitted at the bench, I

believe that a downward departure based on section 5(k)(1.1)

of the guidelines is appropriate in this case and is

supported by the information before me.

                At present, under the advisory guidelines,

Mr. Bailey's range of imprisonment for this case is 120

months.   I'm sorry.   130 to 162 months.   Yes.   That's the

current range.   Okay.   The range as far as Count 1, however,

is 120 months because that's the statutory maximum for that

count.

                You know, there are a number of factors that the

Court has to consider in determining an appropriate downward

departure, whether one is warranted and to what extent the

departure should be.   I know that the parties have some

dispute with respect to one of the guideline factors, which is under section 5(k)(1.1)(a)(1). You've both expressed your different points of view with respect to Mr. Bailey's compliance with that factor. However, I think it is appropriate to give greater weight to the government's evaluation of the significance and usefulness of the defendant's assistance, including any information that tends to detract from that. And I've considered that factor as well as the other factors.

And the overall impression that I have from reading the motions and hearing the information that you all provided to me is that while Mr. Bailey's assistance might warrant a downward departure. It was pretty minimal compared to the kinds of assistance that is provided in other cases in which a downward departure motion is being considered.

My impression is that -- and this is not to say that he held back anything -- maybe this was all that he could do. And that's fine. But it, in my view, is pretty minimal. And I think that any significant downward departure would be -- would not be warranted particularly in light of the -- the fact that other defendants are able and have done a lot more than this and have been granted substantial or significant downward departures. Again, I can only characterize Mr. Bailey's cooperation in this case as "minimal" but still sufficient enough to warrant a downward departure.

1    So the government's motion will be granted.   That's

2 Document Number 72, and I believe that a departure downward

3 to 125 months is warranted under the circumstances.

4    Now, Mr. Williams, you wanted to address the issue

5 of a variance.   The Probation Office in paragraph 112 of the

6 Presentence Report identified factors that it believes should

7 be considered for determining whether a variance should be

8 granted in this case.

9    Is there anything that you want to add or supplement

10 to this?

11    MR. WILLIAMS:   No, Your Honor, we would just adopt

12 paragraph 112 of the Presentence Investigation Report as part

13 of our argument.

14    THE COURT:   Okay.   Is there any response from the

15 government?

16    MS. WINFIELD:   Your Honor, with response to the

17 adoption of paragraph 112?

18    THE COURT:   On the issue of a variance.   Do you

19 believe that a variance is appropriate or not?

20    MS. WINFIELD:   Oh, in this particular case, Your

21 Honor, we would not object to a variance based off of the

22 information in paragraph 112.

23    THE COURT:   Well, I have considered those factors,

24 and there's no dispute as to the accuracy of the information

25 regarding Mr. Bailey's childhood and the issues that he

faced.

My concern is this: Mr. Bailey has a pretty lengthy criminal history, which includes a prior federal conviction for felon-in-possession of a firearm  And, in fact, he was under a criminal justice sentence at the time that he committed the crime in this case.  I am also concerned about Mr. Bailey's extensive history of substance abuse and his noncompliance with the conditions of his pretrial release.  I also consider that Mr. Bailey, according to the Presentence Report, did not indicate any interest in participating in a substance abuse program or in any mental health treatment while incarcerated.  And that's certainly his choice.

The problem that I face is this:  While there may be factors that warrant consideration for a downward variance, I believe that a downward variance would result in a sentence that would not adequately reflect the seriousness of his crimes, after taking into account Mr. Bailey's history and characteristics.  I don't believe that a sentence below the point to which I have already departed would be sufficient to address the goals of the federal sentencing laws.

And I also believe that a sentence below the departure point would not promote respect for the law on Mr. Bailey's part.  So while I agree that there may be factors warranting a downward variance and I've considered those factors, I don't believe that a downward variance is

1      appropriate in this case.   So that request is denied.

2            Is there any reason that sentence should not be

3      imposed at this time?

4            MR. WILLIAMS:   No, Your Honor.

5            MS. WINFIELD:   No, Your Honor.

6            THE COURT:   All right.   Mr. Bailey, is there

7      anything you'd like to say?

8            THE DEFENDANT:   Yes, ma'am

9            THE COURT:   Go ahead, please.

10           THE DEFENDANT:   Ma'am, I understand that my

11     participation in this crime was voluntary.   I understand that

12     my participation in this crime perhaps enabled the crime to

13     further.   But I was not the center of this crime.   I was in a

14     position where I was out of work.   I was living with

15     Mr. Campbell, he was putting a roof over my head.

16           I did not make any benefits from this crime nor did

17     I set out to defraud the government in any way, shape, or

18     form   I did not participate in any money laundering

19     activities, other than me sending out Western Union's for Mr.

20     Campbell.   I didn't even get money off of the rent for that.

21     I mean, that was just something I was so far in debt with

22     him -- I was $4,500 in debt with him -- that I felt somewhat

23     obligated to help him in any way, shape, or form that I could

24     and had provided a roof over my head.

25           I was out of work and I didn't have any place to

live.   I reaped no benefits from this $436,000 or whatever it
is.   That was not money that went to me.   The $40,000 --
$30,900 that I sent out in Western Union's was not even my
name.   It was money that I took from Mr. Campbell with
instructions from Mr. Campbell to send to people he told me
to send it to.   The benefits of the steroids that were
returned to this country were totally reaped by him   They
were not reaped by me.

       The DEA officer sat out in the farm and watched me
log and work every day, six days a week in order to pay
Mr. Campbell back the $4500 that I owed him   And I did so.
Had I known the legal ramifications of my sending that money
out, I would have never, ever agreed to it.   I didn't do this
to hurt anyone.   I did this to keep myself stable; to keep
myself a roof over my head; and a place to live and a place
to work so that I could see my children and be with my
family.

       I've worked from 1998 for the same company that
closed down in 2009.   And from then on, it was just a job
here and a job there.   The things that I did when was
18-years-old, I was 18-years-old.   I was put in a situation
that -- I was raised in a violent situation.   And when people
approached me with violence -- more than one person -- I
reacted in a way that kept me from harm   But I didn't
overreact.

1    I didn't continually hurt anyone.  I defused the
2    situation with one swing, and that was it.  And because of
3    that, when I was 18-years-old -- when I was 28-years-old the
4    police were called to my house and a gun was taken from my
5    home that was under my bed.  That wasn't used to participate
6    in any crime whatsoever.  It was simply there for
7    self-defense.  That's all it was there for.

8    They took the gun.  And because of what I did when I
9    was 18-years-old, they put me in prison for four years.  I
10   had received a sentence of 57 months.  And at that time, that
11   was the longest sentence I had done.  I have not hurt anyone
12   in my mind ever since I was a child.  I have not possessed a
13   handgun or any kind of gun since the federal system put me
14   away for it.

15   I have not repeated any crime that I have committed.
16   Any crime that I have been punished of, I was punished, and I
17   learned.  I learned and I shied away from them   Had I known
18   that sending that money out was going to result in the loss
19   of years of my life, had I known that that was even a
20   possibility, I would not have taken that action.  I would
21   have lived on the street before I would have lived in a cage.
22   I'm asking you for mercy; justice.  Something to help me.

23   The four years that I spent in federal prison made
24   me a very angry individual.  It took six years to get most of
25   that out of me, which most of it's out.  But now we're

talking about ten years, and I just don't know that I have
that in me, Your Honor.  I really don't.  I mean you can look
on my criminal history.  You can look at my records, but you
don't know my situation.  I mean I never went out with the
intention to hurt anyone.

The felon-in-possession of a firearm, I was under
the impression -- I understand that ignorance of the law is
not an excuse, but it was my impression that there was a
statute of limitations.  The statute of limitations didn't
exist in the federal system  Had I known it was illegal for
me to own a gun in my home, which I was raised by Marines and
police and very big constitutionalists, I thought that that
was something that was legal.  And when I found out that it
wasn't, I found out the hard way.  Very hard way.

I've missed seven years of my daughter's life.  She
is 21-years-old now.  I have a four-year-old daughter now.  I
don't want to miss her growing up too.  And to miss all of
this because of someone else's money, because of someone
else's gain, I -- I gained nothing.  I didn't get free
steroids for myself in this case, ma'am  I still had to pay
for everything.

As far as my distribution aspect of it, I had a few
friends from the gym that I sold a few bottles to now and
again.  The weight of this is not on me nor would I have
allowed it to be on me.  I had no idea how big Mr. Campbell's

1    operation was.  He did not disclose those things to me.  He

2    kept his own records, and he kept all of that to himself.  I

3    had no idea there was $400,000 on this case.  I -- I really

4    could not fathom it, because I did not see any of it.  None

5    of it came to me.

6         So I'm asking you -- I'm begging you -- I will lay

7    prostrate in front of you if I have to, please do not break

8    me as a person completely down.  I didn't do this to hurt

9    anybody.  I really didn't.  And if you can find some way to

10   help me out of this situation, I would not by any means,

11   shape, or form relinquish that chance.

12        THE COURT:  Thank you.  Mr. Williams?

13        MR. WILLIAMS:  Nothing further, Your Honor.

14        THE COURT:  Ms. Winfield?

15        MS. WINFIELD:  Nothing further, Judge.

16        THE COURT:  Well, as I said before, Mr. Bailey, I

17   have to determine a sentence that is sufficient but not

18   greater than necessary to address the goals of the federal

19   sentencing laws, and I have considered your history and

20   characteristics in making that determination.  I also have

21   considered the seriousness of these offenses.

22        You know, I listened very carefully to what you just

23   said, and you spoke very passionately; and I certainly sensed

24   what I assume is some sadness on your part about the

25   situation that you find yourself in.  But what is very

1  troubling to me is that much of what you said was an effort

2  to minimize your involvement in these crimes.

3          Maybe Mr. Campbell was the mastermind.  I don't

4  know.  But you clearly were involved in these crimes, and you

5  knew exactly what you were doing.  And for you to stand up

6  here and say, "Well, gee.  If I had known that it was going

7  to be this bad, I would have never done it," that just

8  doesn't make sense.  Because just a few weeks ago or months

9  ago, you stood here and said under oath when you pled guilty

10  that you knew what you were doing; and you knew it was a

11  crime.  So, you know, maybe you didn't realize that you could

12  go to prison for as long as you can for these crimes.  But as

13  you pointed out, ignorance of the law is no excuse.

14          You talk about your never having hurt anybody.  You

15  have a conviction for assault -- well, one felony conviction

16  for assault second, where, according to the Presentence

17  Report, you followed the victim to a mobile home park; got

18  out of your car; and hit the victim with a wooden club and

19  broke the victim's hand.  That's pretty violent.  And I don't

20  know how you can say you didn't intend to hurt anybody.

21  Clearly, you did.  And you were convicted of that, and you

22  received a sentence of imprisonment in the Department of

23  Corrections for that crime.

24          As far as the felon-in-possession crime is

25  concerned, I cannot imagine anyone thinking that there's some

1   kind of statute of limitations on when a felon can possess a

2   firearm.  It was illegal for you to possess a firearm.  You

3   were convicted of that.  And this was a shotgun that was

4   found in your possession.  And the only reason the police

5   found it was because they were called to your house by a

6   woman who claimed that you had assaulted her sexually.

7           So, you know, those are just two examples of the

8   criminal activity you've been involved in.  And I find it

9   difficult to accept that someone who is certainly no stranger

10   to the criminal justice system can stand here and suggest

11   that, you know, he served as an innocent dupe in all of this

12   activity.  You were not.  And, you know, I agree that the

13   sentence of imprisonment in this case is a long one.  No

14   question about it.

15           But, you know, it could have been longer but for the

16   downward departure.  And I believe that the sentence is

17   appropriate.  The aggregate sentence of 125 months is

18   appropriate to promote respect for the law and to address the

19   issues of punishment, deterrence, and incapacitation.

20           So for those reasons it will be the Judgment of the

21   Court that you be committed to the custody of the Bureau of

22   Prisons to be imprisoned for a term of 120 months on Count 1,

23   and for a term of 125 months on Count 2.  The terms of

24   imprisonment will run concurrently for an aggregate term of

25   125 months.

1    Following your release from prison, you'll be placed

2    on supervised release for a period of two years on each

3    count.   The terms of supervised release will also run

4    concurrently.   While you are on supervised release, you'll

5    have to follow the standard conditions of supervision that

6    the Court has adopted, as well as some additional conditions.

7    If there are any costs associated with your compliance with

8    these conditions, you will have to pay those costs based on

9    the copayment fee schedule established by the Probation

10   Office.

11       The first condition is that you not use any

12   controlled substance unlawfully; and that you submit to a

13   drug test within the first 15 days of your supervised release

14   term and submit to at least two drug tests after that.

15       As a further condition, you'll have to participate

16   in a substance abuse treatment program as directed by the

17   Probation Office, and that program will include drug

18   counselling and drug testing.

19       As a further condition, you will not be permitted to

20   drink any alcoholic beverages or use any intoxicants.

21       It will also be a condition that you participate in

22   a mental health evaluation; and that you follow any

23   recommendations resulting from that evaluation, including

24   participation in a mental health program approved by the

25   Probation Office.

1              It will also be a condition that you participate in

2      a domestic violence counselling program approved by the

3      Probation Office; and that you participate in a cognitive

4      behavioral treatment program as directed by the Probation

5      Office.

6              As a further condition, you will not be permitted to

7      maintain or purchase any post-office box or private mailbox

8      or storage unit or locker or other facility without first

9      receiving the written approval of the Probation Office.

10             And, finally, it will be a condition that you submit

11     yourself, your home, your office, and your vehicle to a

12     search by the Probation Office if there is reasonable

13     suspicion that contraband or evidence of a supervised release

14     violation present.   You will be responsible for warning

15     others that this search condition is in effect.

16             Was there a forfeiture as to Mr. Bailey as well?

17             MS. WINFIELD:   Yes, Your Honor.   The defendant

18     consented to a money judgment of $30,978; as well as a

19     forfeiture allegation which included $6,482; a 2008 Chrysler

20     300 LX; and 2008 BMW 535i.

21             THE COURT:   Where is the Consent to the Money

22     Judgment of $30,000?   Was that filed?

23             MR. WILLIAMS:   That is included in the plea

24     agreement, Your Honor.

25             MS. WINFIELD:   Your Honor, it's on top of page 13.

1    The bottom of the first paragraph.

2          THE COURT:  Okay.  Well, here's what I am going to

3    do:  In the Judgment, the defendant will forfeit to the

4    United States the sum of $6,482 as well as all interest that

5    he has in the motor vehicles that are described in the plea

6    agreement on page two.  As far as the $30,000, if this is a

7    Consent Judgment, then that is something separate from the

8    forfeiture, and that's something that the two of you will

9    need to submit to the Court.

10          All right.  There will be no fine; however, there is

11   a $200 assessment which is due in full today.

12          Was there a waiver of appeal in this case?

13          MS. WINFIELD:  Yes, Your Honor.

14          THE COURT:  Mr. Bailey, if you think your waiver of

15   appeal isn't enforceable, then you may file a Notice of

16   Appeal within 14 days of today.  If the Notice is not filed

17   on time, you could lose your right to appeal.  If you are

18   unable to hire a lawyer, one will be appointed to represent

19   you free of charge.  Also, you'll be allowed to file the

20   notice free of charge if you can't pay the filing fee.

21          It will be Mr. Williams' responsibility to either

22   file the Notice of Appeal for you or to file a statement with

23   the Court that you do not wish to appeal this judgment.

24          Do you understand your appeal rights?

25          THE DEFENDANT:  Yes, ma'am

1     THE COURT: Is there any recommendation you'd like

2 me to make to BOP?

3     MR. WILLIAMS: Your Honor, Mr. Bailey has family in

4 both Springfield, Missouri, and St. Louis, Missouri. We

5 would just request that he be placed as close as possible to

6 either of those locations.

7     THE COURT: I will include that recommendation in

8 the Judgment.

9     MR. WILLIAMS: Thank you, Your Honor.

10     THE COURT: Anything else?

11     MR. WILLIAMS: Nothing for the defense.

12     THE COURT: Well, unless you object, I will

13 recommend that Mr. Bailey be allowed to participate in the

14 Residential Drug Abuse Program if he is eligible to do so.

15 But if that's not something you're interested in, I won't

16 recommend it.

17     THE DEFENDANT: I'm interested in it.

18     THE COURT: I will also recommend that Mr. Bailey be

19 allowed to participate in any vocational training programs

20 that may be available in BOP, unless you object to that.

21     THE DEFENDANT: No, ma'am

22     MR. WILLIAMS: No objection.

23     THE COURT: Finally -- and this is not subject to

24 discussion -- I am going to recommend that Mr. Bailey

25 participate in a mental health program during his

1    incarceration.   Okay.   Is there anything else on this case?

2              MS. WINFIELD:   No, Judge.

3              MR. WILLIAMS:   No, Your Honor.

4              THE COURT:   All right.   Oh, I'm sorry, there is

5    something else.   On the issue of bond, I don't know if you

6    want to be heard on the issue of voluntary surrender.   I am

7    willing to hear whatever you have to say.

8              MR. WILLIAMS:   Your Honor, our position is that

9    Mr. Bailey be allowed to voluntarily surrender himself.   You

10   know, at this time, he is no flight risk, despite the severe

11   sentence that he faces.

12             In his time out on bond, he has committed no other

13   criminal acts and is not a danger to the community.   And

14   also, Your Honor, he is very close to his two grandparents.

15   And, you know, this may be the last time that he does have

16   with them   So on behalf of Mr. Bailey, I would just request

17   that he be allowed to voluntarily surrender and spend his

18   last few months or time out with them   And, Your Honor, Mr.

19   Bailey would like to add to that.

20             THE COURT:   Go ahead.

21             THE DEFENDANT:   Your Honor, as far as the violations

22   of my pretrial release, I believe I have three -- three

23   instances where I didn't show up for a urinalysis, which all

24   of those instances.   I called Michael Moran (phonetic), my

25   officer.

1    The first instance, I had asked for permission to go
2  to Jefferson City.  At which point, when I went to Jefferson
3  City, asked for my previous federal release with Raoul
4  Williams.  I had a urinalysis while I was up in Jefferson
5  City.  I didn't have to call in or anything like that.  He
6  made it aware to me that that wasn't the case this time.
7    The second time I actually had vehicular problems.
8  My tire was flat, and it was 6:30 at night.  I had to be
9  there by 7:00.
10    The third instance, I was actually working on a
11  Saturday; and my boss called him, and I called him, and I
12  called everybody possible.  Tried to go in the next day for
13  it.  Those are the three instances in which I did not comply,
14  but it wasn't voluntary noncompliance, if you will.
15    I've been taking six urinalysises every month (sic).
16  I've been taking the guidance of counseling through their
17  services twice month, and I have not missed those.  I missed
18  one guidance counseling, but I made it up the very next week.
19    THE COURT:  Well, according to the report from the
20  Pretrial Services Office, Mr. Bailey had one positive
21  urinalysis for the use of marijuana.  And that was in July,
22  which would have been shortly after his arrest in this case.
23  However, there were one, two, three, four scheduled
24  urinalysis testing appointments that were missed.  And the
25  Pretrial Services Office felt that those misses were serious

1  enough to warrant increasing the number of drug tests; and

2  the number of counseling sessions; and to warrant verbal

3  reprimands.   The Pretrial Services Office has recommended

4  that Mr. Bailey not remain on bond due to his poor adjustment

5  on supervision.

6          I believe probably the only reason I allowed

7  Mr. Bailey to remain free on bond following his guilty plea

8  was to enable him to provide substantial assistance for

9  purposes of the downward departure motion.   And I don't

10  believe it is appropriate today to continue his release, in

11  light of the sentence that has been imposed in this case as

12  well as his conduct while on pretrial release.   So the

13  defendant's request for voluntary surrender is denied and,

14  the defendant is remanded to the custody of the Marshal's

15  Service.

16          Is there anything else?

17          MS. WINFIELD:   No, Your Honor.

18          THE COURT:   All right.   We are in recess.

19              (Proceedings concluded at 11:11.)

20

21                  *    *    *

22

23

24

25

UNITED STATES OF AMERICA                    )
                                            )   ss:
EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION )

C E R T I F I C A T E

       I, Gary Bond, Certified Shorthand Reporter in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings had the 17th day of September and the 18th day of December, 2012, in the above mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

       I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

       I further certify that this transcript contains pages 1 through 45 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

       IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 31st day January, 2013.


           /s/ Gary Bond
           Gary Bond, RPR, RMR
           Certified Shorthand Reporter